## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, JOSEPH DOE, | : | |
| and JANE DOE | : | |
| of Abington, Pennsylvania | : | |
| | : | |
| | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. |
| | : | |
| ALBRIGHT COLLEGE | : | |
| 621 N. 13th Street | : | |
| Reading, Pennsylvania 19604 | : | |
| | : | Jury Trial Demanded |
| | : | |
| Defendant | : | |

## COMPLAINT

### I.    Preliminary Statement

1.     This action is brought by John Doe ("John"), a pseudonym for a young man unfairly and falsely accused of sexual misconduct (i.e., a sexual assault) by a female student (the "Accuser" or "Complainant") at Defendant Albright College ("Albright" or "Defendant"), which John formerly attended; as well as his parents, Joseph Doe and Jane Doe.  A seriously deficient investigation and administrative hearing at Albright initially erroneously found John to have been responsible for such alleged misconduct.  He was later, and correctly, found to be not responsible in a second proceeding, but only after having suffered devastating humiliation, emotional trauma, and other damages as described herein.

2.     In response to the false complaint of sexual assault, Defendant rushed to judgment, following an entirely inadequate investigation, including the failure to interview numerous witnesses who would have corroborated John's version of events and rendered incredible the version of events offered by the Accuser.  Instead, Defendant chose to interview

only two female friends of the Accuser (and ignore the male witnesses who had far more direct and substantial information about the events in question) before initiating and adjudicating disciplinary proceedings against John. These facts, along with other circumstances, establish that Defendant's actions and inactions were unlawful and the product of gender bias.

3.     The disciplinary hearing that John attended was riddled with profound and obvious procedural errors in violation of the policies and procedures set forth in Defendant's own student handbook and Title IX of the Educational Amendments of 1972 as described herein. For instance, in direct violation of the student handbook and federal law, John was barred from calling crucial witnesses for a purported failure to give some particular "notice" of the witnesses, where there was no such provision in the student handbook. Moreover, John, in direct violation of the student handbook and federal law, was forced to testify prior to the Accuser, giving her the opportunity to mold her story in reaction to John's testimony, and depriving John of the opportunity to rebut the Accuser's false allegations.

4.     The result of these flawed and discriminatory proceedings was that John was improperly and erroneously found "responsible" on the false charge of sexual misconduct, which resulted in financial damages (to both him and his parents), academic decline, social isolation, humiliation, embarrassment, and significant emotional suffering, which continues to the present.

5.     Following the "responsible" determination, John filed an appeal to Gina-Lyn Crance, Albright's Vice President for Student Affairs and Dean of Students, which, due to admitted major violations – both substantive and procedural – in the first hearing, resulted in his being granted a new hearing. The result of this hearing, which eliminated some, but not all, of the highly prejudicial errors of the first hearing, was that John was correctly found "not

responsible" for the false sexual misconduct charge.

6.     The "not responsible" determination following the second hearing in no way vitiated the damages caused by Defendant's actions and inactions with relation to the flawed investigation and first hearing.  John remains stigmatized and traumatized; he was emotionally unable to return to Albright, and his academic career and potential future earning power have been greatly, and negatively, affected by the events at issue.  While John has struggled to "move on" with his life following the events at issue, the lasting affects of Defendant's actions and inactions continue and will continue into the future.

## II.     Parties

7.     Plaintiff John Doe resides in or around Abington, Pennsylvania.  His parents, Joseph and Jane Doe, reside with him in Abington, Pennsylvania.

8.     Defendant Albright College is located at 621 N. 13th Street, Reading, Pennsylvania 19604, 19426.  During all times relevant to this complaint, Albright was the recipient of several sources of federal funds.

## III.     Jurisdiction and Venue

9.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this case raises federal questions under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).  This Court has further jurisdiction over Plaintiffs' state law claims on the basis of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

10.     All of the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania.  Venue is

appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV.    **Additional Facts Supporting Liability**

11.    Plaintiff John Doe and the Accuser were students at Albright University during all relevant times. Albright's Code of Conduct and its procedures and processes are contained within a publication called *The Compass,* and constitute a binding contract between the Plaintiffs and Albright.

12.    At the time that the Accuser falsely accused John of sexual misconduct, John and the Accuser had known each other for some time, having met in 2014.

13.    John was accused of sexual misconduct by the Accuser as a result of alleged events that commenced on the night of January 7, 2016. After some delay, during which time the Accuser attended a party at John's house, along with her boyfriend ("Boyfriend"), and followed John on social media and "liked" some of his posts, the Accuser complained to the Reading Police Department and then, after some weeks, to Albright authorities, that she had been the victim of a sexual assault.

14.    The Reading police investigated the Accuser's's allegations, and conducted at least two formal interviews with John. John also provided names of witnesses to the Reading police, who, following their investigation, brought no charges against John.

15.    On February 5, 2016, approximately three weeks after making her complaint to Reading police, the Accuser complained to Albright authorities.

16.    In brief, the Accuser alleged that on January 7, 2016, she had been drinking alcoholic beverages with friends, including John, at a bar in Reading near the Albright campus. She then accompanied John to his home where she stayed the night.

4

17.     The Accuser stated that, due to her voluntary consumption of alcoholic beverages that night, she had *no recollection* of the events that occurred after she entered John's home, but that she somehow *believed* that she had been sexually assaulted by John.

18.     The Accuser, in her statement to investigators, described herself as an amnesiac who did not remember the critical portion of the night in question.  She told investigators that she was with John at the bar, where she became voluntarily intoxicated, and then voluntarily drove with John to his home.  She further claimed that she had no recollection of the time period during which she was supposedly sexually assaulted.  She did not tell investigators that she did not consent to having sexual relations with John, or in any way objected to having sex with John. She also did not claim that she was unconscious during sexual relations with John.

19.     The Accuser's statement consisted of two pages, only two paragraphs of which had to do with the acts alleged.  The remainder of her statement addressed John's alleged behavior relative to Boyfriend, a lacrosse teammate of John's, and other ancillary matters.

20.     In her statement to Albright, the Accuser omitted crucial facts.  She omitted that she invited John to meet her at the bar.  She also omitted that she purchased and provided alcohol to John.  She also omitted that at the bar she asked John to drive her in her car to his home.  She further omitted that she told him at the bar that she wished to stay the night at his home.  She further omitted that she saw John's roommate ("Witness 1"), in the bedroom.  She further omitted to mention any of the numerous persons present in John's home the morning after the alleged assault.  She further omitted that, the following morning, she drove with John back to the bar (in order to attempt to close out her bar tab), and then back to John's house. She also omitted that she had continued social contact with John following the supposed assault,

including attending a party at John's house along with Boyfriend a week afterwards, and following and "liking" John's social media posts. These omissions, concerning periods of time during which the Accuser did *not* claim to have amnesia, were willful.

21.     Albright conducted virtually no investigation of the matter. Its entire investigation consisted of four interviews.  Three of the interviews were of female students, including the Accuser.  Despite other male students being present at the bar and at John's home, and other male witnesses having exculpatory evidence regarding the events on the night in question and the next morning, the only male student interviewed was John.

22.     The two other female students named by the Accuser were interviewed on March 10, 2016. Their interviews were each less than one page in length.  They denied any knowledge of the assault, or of any untoward events whatsoever, and one even denied being present at the bar or afterward.

23.     John voluntarily submitted to multiple interviews with the Albright investigator in which he admitted to having sex with the Accuser, but insisted that the sex was initiated by the Accuser and was entirely consensual.  John's initial written interview was four pages in length and, in stark contrast to the Accuser's statement, provided a detailed description of the events of the night in question.

24.     In its investigation, Albright employed a female lead investigator, Becki Achey, who, as noted, interviewed three female witnesses including the Accuser, and no male witnesses other than John.  Ms. Achey reported to a female Assistant Dean of Students and Director of Community Standards, Amanda Hanincik.  Ms. Hanincik, in turn, reported to a female Vice-President of Student Affairs and Dean of Students, Gina-Lyn Crance.

25.     In Albright's investigation, despite their being several male witnesses to the alleged events of January 7, 2016, *no male witnesses* other than John were interviewed, including a male witness ("Witness 2"), who accompanied John and the Accuser home after leaving the bar, and slept in John's house that night; and John's roommate Witness 1, who *slept in the same room* as John and the Accuser on the night in question, and observed John and the Accuser in bed the following morning engaged in soft conversation. Albright further did not interview another male witness ("Witness 3"), who observed the Accuser's friendly interactions with John at the bar, and who also had information regarding the Accuser previously lying about having sex with Witness 3 in order to make Boyfriend, who was Witness 3's roommate, jealous. These male witnesses had clear exculpatory evidence, yet Albright investigators declined to even interview them.

26.     Albright also did not interview the Accuser's Boyfriend, who was a fellow member of the lacrosse team with John, and thus likely to become aware of the Accuser's sexual interlude with his teammate (with the obvious resultant displeasure, anger, or jealousy) even though other interviews confirmed that the Accuser told him some version of her story. The Accuser's boyfriend also would have confirmed that the Accuser, following the events in question, attended a party at John's house with Boyfriend, and that the Accuser had previously lied about having sex with his roommate, Witness 3, in order to make him, Boyfriend, jealous. Although Albright investigator Achey was in close contact with a Reading Police Department investigator who interviewed Boyfriend, Achey never sought a copy of the interview.

27.     As Albright's biased and uninformed approach to the investigation became clear to John, he sought the assistance of a relative ("Relative") who is licensed to practice law in

Pennsylvania.

28.     Relative read the statements generated by Albright's investigation, and interviewed John. Relative then corresponded with Dean Hanincik via a series of emails.

29.     In that series of detailed emails, Relative, among other things, pointed out the inherent impossibility of proving an allegation whose underlying facts cannot be known because the investigation relies on the delayed report of a person who did not even remember the events in question.

30.     Also in his emails to Hanincik, Relative noted the existence of additional witnesses not interviewed by Albright, including Witness 1 and Witness 2. He related facts revealed to him by John (and some included in John's Albright interviews) that directly contradicted the Accuser's version of events, and which could be confirmed by independent witnesses that Albright had declined to interview.

31.     Relative repeatedly encouraged Albright to make additional investigative efforts. He proposed a reasonable disposition of the matter pursuant to the behavior that John had in fact engaged in, that is, underage drinking.

32.     Albright rejected and rebuffed every request to expand their investigative efforts. Instead, declining to even *attempt* to discover further information, it treated John as if he had already been found guilty. He was dismissed from the lacrosse team and was told to notify his coach of the dismissal in person. While he was allowed to attend classes, he was not permitted in the cafeteria or gym. He was also directed to avoid the Accuser.

33.     After its minimal and biased investigation, on March 23, 2016, Albright formally charged John with Jeopardizing Safety-Sexual Misconduct, and set a hearing date of March 31,

2016 before a panel of Albright's Community Standards Hearing Board. The charging document was a letter signed by Amanda Hanincik. That letter also falsely and unlawfully stated that John was entitled to an Advisor, but that the Advisor must be "... any Albright full-time faculty, student, or staff member," in direct contravention of Title IX.

34.   Prior to the hearing, Albright refused to provide John with the names of the members of the panel that would decide the case.

35.   The hearing was overseen by Amanda Hanincik, the same Albright administrator who had approved the charges against John. The "Hearing Officer" was a female teacher, Denise Greenwood.

36.   Albright initially limited John to the calling of one witness on his own behalf, and then refused to allow him to call even that single witness, citing a purported "lack of notice" and incredibly asserting that any witness must be an Albright student. This was in direct violation of the procedures set forth in the *Compass*, and under Title IX, which contained no such limitations. This inability to call witnesses for entirely invalid reasons severely prejudiced John's ability to contest the charges against him.

37.   At the hearing, Albright, over John's objection, required him to testify prior to the Accuser, which also was in clear violation of its own policies and procedures as contained in the *Compass*, which were cited to the Board at the time, as well as Title IX. This known violation of Albright's own policies and procedures and Title IX deprived John of the ability to rebut the Accuser's testimony – which differed greatly from her statement to Albright's investigator – and allowed the Accuser to shape her testimony in reaction to the accused's testimony.

38.   At the hearing, the Accuser was not required to be present. Instead, she was at a

remote location, and, on information and belief, in the company of Albright's female investigator. Rather than testify in person, she testified, after John, by voice only, over the telephone. This unfairly deprived John of the ability to confront his accuser in person, and deprived the Board of the ability to fully assess the Accuser's credibility, including in relation to John's credibility.

39.     As noted, the Accuser's testimony differed substantially from her statement to Albright's investigator, yet John was prohibited from cross-examining the Accuser and the panel then declined to pose questions to the Accuser that had been submitted by John.

40.     John's advisor, Relative, was permitted to be present at the hearing, but not allowed to participate. When Relative noted the egregious procedural errors he was threatened with expulsion from the proceedings. When he attempted to consult with John, as is permitted, he was again threatened with expulsion, ostensibly for speaking loudly, while the panel ignored Relative's explanation that John suffers from Attention Deficit Hyperactivity Disorder ("ADD"), which required reasonable accommodations under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

41.     After being denied the ability to call exculpatory witnesses, being required to testify prior to his accuser, and then confronted with the altered testimony of a self-proclaimed amnesiac, offered over the telephone, the hearing was adjourned. John was notified on April 6, 2016 that he had been found responsible for sexual misconduct.

42.     Albright imposed a formal penalty of suspension, probation, and counseling of an unspecified nature, but John had already been dismissed from the lacrosse team. Word spread of the outcome of the hearing and John became very depressed. His school work suffered because

he was too embarrassed to attend classes. He was forced to leave school, return to his parents' home, and was confronted with questions about why he was not at school and playing lacrosse.

43.    John is innocent of the charges brought against him, and was wrongly found to have committed the charged offense.

44.    John appealed the erroneous finding in a timely manner by notice to Dean Crance. In his appeal, John cited the egregious procedural errors made by the panel, after-discovered evidence, and the fact that the panel had made a clearly erroneous decision. John requested a dismissal of the charges or, in the alternative, a new hearing.

45.    Albright ignored John's argument for a dismissal of the charges against him. Instead, Crance, by letter to Dean Hanincik, copied to John and others, announced that she was "remanding this matter for a new hearing before the *same* Community Standards Hearing Board chaired by Denise Greenwood." (emphasis added)

46.    In her letter, Albright, through Crance, acknowledged the impropriety of requiring John to present his testimony at the hearing before the Accuser. Albright further acknowledged the impropriety of denying John the ability to call witnesses at the hearing. Albright thus admitted that the procedures utilized in the first hearing violated Albright's own policies and procedures and Title IX.

47.    In her "remand letter," Crance directed the hearing panel to "submit special findings of fact on the issue of consent." Crance, in addition, directed that the Accuser be notified that John would be advised by a lawyer at the hearing and that the Accuser may also have a lawyer for an advisor.

48.    The *Compass*, containing Albright's published guide to its disciplinary

11

procedures, makes no provisions for a "remand" or "rehearing." Nor does it contain any reference to or permission for "special findings."

49.     As noted above, Albright intended to proceed with a rehearing via a panel that was made up of the same members as the first panel that had found John responsible. Albright denied John's request for a panel made up of new members for the sake of fairness, but in the event utilized new panel members to accommodate vacation schedules.

50.     Prior to the "remand" hearing, John continued to explain to Albright, via correspondence to its counsel, Stock and Roland, the nature of the failures of Albright's investigation and the logical impossibility of a finding of responsibility on the part of John based on the facts alleged in the interviews conducted. John's arguments were ignored and a new hearing was held.

51.     While awaiting the rehearing, John made a number of additional requests of Albright. John requested a copy or transcript of the audio tape of the first hearing. That request was denied. John requested the names of the persons who would make up the panel of the rehearing. That request was also denied. John requested the details of the vote of the initial panel. That request was also denied. John submitted questions to be posed to the Accuser at the rehearing. None were, in fact, posed. John requested that he be permitted to call an expert witness on the topic of blackouts (as the Accuser alleged that she experienced). That request was also denied. John requested to present witnesses to his character at the hearing. That request was also denied. John requested that the character witnesses' written statements be placed before the panel. That request was also denied. John requested that Albright obtain the presence at the rehearing of a student/witness inaccessible to John. That request was also denied.

52.     All of these requests were denied by Dean Hanincik, who had supervised the investigation, presided over the first hearing, and presided over the rehearing, which took place on June 6, 2016.

53.     Prior to the rehearing John, at his own effort and expense, had interviews conducted and reduced to written form. John obtained for the rehearing the voluntary appearance of witnesses who were known to Albright, but never interviewed or even contacted by Albright, despite their being identified to Albright by John.

54.     During the rehearing, Dean Hanincik repeatedly interfered with the ability of Relative to communicate with John by interrupting their conversations and even threatening to expel Relative from the proceedings.

55.     During the rehearing, Dean Hanincik also vigorously attempted to preclude John from entering into evidence a letter from an expert to counter the Accuser's testimony that a rape counselor had concluded that she had been assaulted.   Ultimately, despite Dean Hanincik's efforts to preclude the expert letter in whole or part, the letter was introduced into evidence only after a Board member insisted that he wished to view the expert's letter.

56.     In spite of these procedural irregularities and Dean Hanincik's persistent refusal of John's requests, the panel found John "not responsible" for the alleged assault.

57.     This finding did little to alleviate the damages caused by the unfair results of the first hearing, which was fatally marred by Albright's violations of its own policies, its perfunctory and biased investigation, and its violations of Title IX.

58.     John suffered, and continues to suffer, great emotional damages caused by Albright's actions and inactions as set forth above.  The subsequent finding of "not responsible"

13

did nothing to vitiate the damage to John's reputation caused by the initial flawed proceedings and result. As a result of the flawed proceedings and result, John was emotionally unable to return to Albright. He became socially isolated, and suffered, and continues to suffer, great humiliation. John, due to his suspension and subsequent inability to continue at Albright following the initial finding of "responsible," even following the result of the second hearing, has further been damaged in his future educational and job prospects. Both John and his parents also have been damaged financially by the payment of tuition and fees that became of little value once John became unable to return to Albright to complete his school year, or his degree.

## V.   Claims Asserted

### COUNT I - BREACH OF CONTRACT

#### All Plaintiffs Against Defendant

59.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

60.     In Pennsylvania, disputes like the present one between a student and a private college are cognizable as breach of contract actions. Reardon v. Allegheny Coll., 926 A.2d 477, 480 (Pa. Super.2007) (citing Barker v. Trustees of Bryn Mawr Coll., 278 Pa. 121, 122 A. 220, 221 (1923)), appeal denied, 596 Pa. 755, 947 A.2d 738 (Pa. 2008).

61. ""[W]e review the agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook [ ... ] as we would any other agreement between two private parties." Id.; see also Gati v. University of Pittsburgh of Commw. Sys. of Higher Ed., 91 A.3d 723, 730-31 (Pa. Super. 2014); DiMedio v. University of the Sciences in Philadelphia, 2013 WL 11251568 at*3 (Pa. Super. Oct. 2, 2013) ("Even though the contract between the parties is contained in a Student Handbook, 'we review the agreement

between the parties ... as we would any other agreement between two private parties.'") (quoting Reardon, 926 A.2d at 480).   "The contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." Gati, 91 A.3d at 731.   See also Hart v. University of Pittsburgh, 2014 WL 4218616 at *18 (W.D. Pa. Aug. 25, 2014).   Federal courts applying Pennsylvania law employ a similar analysis.   See North v. Widener Univ., 869 F. Supp.2d 630, 637 (E.D. Pa. 2012); Hart v. University of Scranton, 838 F. Supp.2d 324, 327 (M.D. Pa. 2011) ("In Pennsylvania, 'the relationship between a private educational institution and an enrolled student is contractual in nature.'") (quoting Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super.1999)).   In appropriate circumstances, courts will also look outside of written documents to ascertain the contractual relationship, including the existence of any implied contract, between the parties.   Pik v. University of Pennsylvania, 2010 WL 3933275 at *7 (E.D. Pa. Oct. 7, 2010).

62.     Pursuant to this authority, the provisions of the Albright student handbook, the "*Compass*," comprised a binding contract between John and Albright.

63.     The provisions of the *Compass* also formed a binding contract between John's parents, Joseph and Jane Doe, and Albright.   Joseph and Jane Doe paid substantial tuition and other costs in consideration for, inter alia, Albright's expected compliance with the procedures set forth in the Compass.

64.     Albright committed material breaches of several provisions of the *Compass*.

65.     For instance, under the heading "Procedures" in the section "Administrative and Board Hearings," the "Complainant" is required to first "present[] case and evidence" and "call[]

witnesses." Only after the Complainant presents his or her evidence does the "Accused student present[] case and "call[] witnesses." In the March 31, 2016 hearing, John, the "Accused," over objection, was required to testify first, *before* the Complainant. This bizarre procedure was a clear and direct violation of the procedures set forth in the Student Handbook, and resulted in: (a) John's being prevented from having the opportunity to rebut the Accusers' testimony, (b) the Accuser having the benefit of hearing John's truthful version of events so that she could, and did, mold her version of events in response to John's, and (c) effectively shifting the burden of proof to the accused. Albright later admitted that this process was improper.

66.     John was also prohibited from calling crucial witnesses in his case, and indeed was allowed to call only a single witness, in direct violation of Title IX and the provision in the *Compass* regarding the Rights of the Accused," which includes "the right to call witnesses...." The ostensible reason given was that John had not given 24 hours notice of his intent to call the witnesses. However, no "24 hour notice" provision was contained in the outline of applicable hearing procedures (in the sections entitled "Process" and "Procedures"); instead it appeared in a "Definitions" section following the word "witness." Moreover, nothing in the *Compass* allowed Albright to *entirely preclude* crucial witness testimony on this basis. Indeed, Albright subsequently admitted that *the Compass* did *not* allow the preclusion of witnesses on this basis. As Albright has admitted, "[s]uch witnesses are important in a case where credibility is a significant issue."

67.     The Accuser was also improperly allowed to testify by telephone. While the *Compass* contained a provision that allowed for "alternative options" to be used to separate an accuser and a respondent during a hearing, nothing in the *Compass* permitted the Accuser to

phone in her testimony, and thus deprive the Board of the ability to directly assess her credibility in person. There was nothing preventing, for instance, John from being able to listen to and view the proceedings remotely while the Accuser testified in person before the Board. In a proceeding where assessment of the relative credibility of the Accuser and John was absolutely crucial, allowing the Accuser to avoid direct scrutiny of her testimony and demeanor was a serious and prejudicial violation.

68. Defendant's violations of the procedures set forth in the Albright student handbook, the *Compass*, constituted a breach of the contract between Albright and John.

69. The breach resulted in an unfair hearing and an erroneous result, which caused the John emotional, financial, and other damages.

70. Plaintiffs were financially damaged by having to pay for tuition, books, fees, a meal plan, housing, and other incidental costs, all of which were borne by John's parents and are subject to repayment, and all of which were rendered useless by Albright's actions and inactions in pursuing meritless charges of sexual misconduct and violating its own procedural rules in violation of Plaintiffs' contract with Albright.

71. The breach of contract was of such a kind that serious emotional disturbance was likely in the event of a breach in that failure to follow the policies and procedures set forth in the Compass would likely lead to an erroneous finding of sexual misconduct as, in fact, happened in this case, causing John great embarrassment, humiliation, and emotional harm. Therefore, John can also recover damages for the emotional harm and for other compensatory damages resulting from Defendant's breach. Salsi v. Paul Revere Life, 2006 WL 140585 at *3 (E.D. Pa. Jan. 13, 2006) (citing, inter alia, Birth Center v. St. Paul Companies, Inc., 787 A.2d 376, 385 (Pa. 2001);

Novick v. Unumprovident Corp., 2001 WL 793277 at *1 (E.D. Pa. July 10, 2001)).

## COUNT II - VIOLATION OF TITLE IX

### Plaintiff John Doe Against Defendant

72.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

73.     Title IX  of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX") provides in pertinent part: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is enforceable through an implied right of action.   Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 65 (1992).

74.     The United States Department of Education and the United States Department of Justice have also adopted regulations that require schools to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student ... complaints alleging any action that would be prohibited by" Title IX regulations.   34 C.F.R. § 106.8(b); 28 C.F.R. § 54.135(b).

75.     To prove a *prima facie* case under Title IX, a plaintiff must plead and prove that he was excluded from participation, denied the benefits of, or subjected to discrimination in an educational program, that the program receives federal assistance, and that the exclusion was on the basis of his sex.

76.     At all relevant times, Defendant received federal financial assistance from several sources.

77.     Where a student seeks damages resulting from the erroneous outcome of a school

18

disciplinary proceeding under Title IX, courts have generally followed the framework developed in Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir.1994).  See Harris v. Saint Joseph's Univ., 2014 WL 1910242 at *4 (E.D. Pa. May 13, 2014); Doe v. Washington and Lee Univ., 2015 WL 4647996 at *9 (W.D. Va. Aug. 5, 2015).

78.     Yusuf recognized two categories of claims of gender bias in university discipline: (a) claims of an erroneous outcome from a flawed proceeding; and (b) claims of selective enforcement.  Harris, 2014 WL 1910242 at*4 (citing Scott v. Worldstarhiphop, Inc., 2011 WL 5082410 at *4 (S.D.N.Y. Oct. 25, 2011), vacated on other grounds, 2011 WL 13079877 (S.D.N.Y. Dec. 12, 2011)).

79.     John in this matter asserts his Title IX claim under an erroneous outcome of a flawed proceeding.

80.     John is innocent and was wrongly found to have committed the offense for which he was initially found "responsible."

81.     The outcome of the original March 31, 2016 hearing, wherein John was found to be "responsible" on the charge of "jeopardizing safety – sexual misconduct," and a suspension was imposed, was manifestly erroneous.  Indeed, at the subsequent July 14, 2016 hearing, where the proceedings were, although still flawed, *less* flawed than in the original hearing, John was found to be "not responsible."

82.     The circumstances herein establish that gender bias was a motivating factor behind the erroneous finding. Harris, 2014 WL 1910242 at *4.

83.     The particular circumstances of Defendant's investigation of the alleged assault and the conduct of the March 31, 2016 hearing establish that gender bias was a motivating factor

behind Defendant's actions and inactions, and ultimately the erroneous finding following the March 31, 2016 hearing that John was "responsible" on the false charges.

84.    In Defendant's investigation, despite there being several male witnesses to the alleged events of January 7, 2016, *no male witnesses* other than John were interviewed, including Witness 2, who accompanied John and the Accuser home after leaving the bar, and slept in the John's house that night; and John's roommate, Witness 1, who *slept in the same room* as John and the Accuser on the night in question, and observed John and the Accuser in bed the following morning engaged in soft conversation.   Despite the clear and obvious relevance of their information, Defendant failed to interview these male witnesses, but instead interviewed, besides the Accuser, only two *female* students, both friends of the Accuser, one of whom was not even present on the night in question, and the other of whom merely saw the Accuser and John together at the bar prior to their leaving together (along with Witness 2). These circumstances clearly indicate that Defendant was not interested in pursuing information highly relevant to the investigation because it was favorable to the male accused student and was in the hands of male, not female, witnesses, even though the information of the male witnesses, both of whom were present in the house (and one who slept in the same room as the Accuser and John), was far more probative than that of the female "witnesses."   Even when John, through counsel, pointed out this flaw, Defendant nevertheless failed to interview the male witnesses.

85.    At the March 31, 2016 hearing itself, Defendant required the male respondent, John, to testify in person.   Yet, Defendant allowed the female Accuser to testify by telephone. Thus, the female Accuser was allowed to escape in-person scrutiny of her credibility – which was a crucial, indeed, likely determinative, issue in the matter – and treated fundamentally

different from John, for no other reason than the gender of the respective parties.

86.     Moreover, at the hearing, John was inexplicably required to testify prior to the Accuser's testimony, such that he was unable to respond to the specifics of her testimony. The procedure set forth in the student handbook, the *Compass*, required that an accuser testify and present evidence before the accused, and there is no exception (and could not properly be an exception) for cases involving accusations of sexual misconduct. Yet, John was forced to testify before the Accuser. Again, this clearly establishes an unfair and discriminatory view of John and the Accuser based on gender. There can be no conceivable gender-neutral, non-discriminatory purpose in requiring an accused male to testify in person before his female accuser testifies via telephone, thereby depriving him of the ability to rebut her testimony, and allowing her to shape her testimony in reaction to the accused's testimony. To the contrary, these processes created a gender-based purpose of benefitting, assisting, and "protecting" the female Accuser to the detriment of the male respondent.

87.     Moreover, the flawed, shoddy, incomplete and biased investigation, together with the outcome at the first flawed hearing, and the different outcome of the second hearing, clearly presented a gender bias in favor of the Accuser.

88.     From these particular circumstances, the gender bias in the form of favoring a female accuser of sexual assault over a male student accused of sexual assault, and favoring female witnesses with little relevant information over male witnesses with far more pertinent evidence, led to the erroneous outcome of the March 31, 2016 hearing.

89.     As a result of these violations, which led to the erroneous outcome of the March 31, 2016 hearing, John was excluded from major aspects of his educational program, and further

suffered further damages as described herein, including profound embarrassment and humiliation among his friends and peers; was so emotionally affected by Albright's actions that he could not focus on his academic work during the pendency of the proceedings and was unable to complete the semester; and thereafter was emotionally unable to return to Albright as a student.   He has required professional assistance to address the emotional, financial, and academic damage caused by Albright's discriminatory actions, and he will never be able to fully overcome the harm to important personal relationships and his reputation caused by the dissemination of the false allegations and the erroneous decision of the first hearing.   He will suffer loss of future earning power as a result of the Defendant's actions and inactions.

90.     Plaintiffs who prevail in an action under Title IX are entitled to an award of monetary/compensatory damages, reasonable attorneys' fees, and costs.   42 U.S.C. § 1988; Dawn L. v. Greater Johnstown School Dist., 586 F. Supp.2d 332, 386-87 (W.D. Pa. 2008).

## COUNT III - VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE PRACTICES AND CONSUMER PROTECTION LAW

### All Plaintiffs Against Defendant

91.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

92.     Pennsylvania's Uniform Trade Practices and Consumer Protection Law ("UTPCPL), 73 Pa. C.S. §§ 201-1, et seq., creates a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property" as a result of the seller's deceptive or unlawful actions.   Harris v. Saint Joseph's Univ., 2014 WL 1910242 at *6 (E.D. Pa. may 13, 2014) (quoting Wise v. American Gen. Life Ins. Co., 2005 WL 670697 at *7 (E.D. Pa. 2005) (quoting 73 Pa. C.S. § 201-9.2(a)).

93.     "'To state a claim under the UTPCPL, a plaintiff must show: (1) deceptive conduct; (2) an ascertainable loss; (3) justifiable reliance on the defendant's wrongful conduct or misrepresentations; and (4) that such reliance caused an injury.'" Harris, 2014 WL 1910242 at *7 (quoting Pellegrino v. State Farm Fire and Cas. Co., 2013 WL 3878591 at *8 (E.D. Pa.2013). See also Sibeto v. Capella Univ., 2014 WL 3547347 at *4 (W.D. Pa. June 13, 2014).

94.     Defendant engaged in deceptive conduct, including the following:

a.      Representing, warranting and/or guaranteeing that Defendant trained its employees and agents in the proper and unbiased investigation and adjudication of complaints of sexual misconduct when, in fact, it had not.

b.      Representing that it would conduct a proper, fair and impartial investigation and adjudication of The Accuser's allegations against John when, in fact, it would not, and did not;

c.      Representing that it would follow its own procedures in connection with the first hearing when, in fact, it would not, and did not; and

d.      Misrepresenting Albright's compliance with Title IX.

95.     Plaintiffs purchased educational services from Albright for which they remitted payment.

96.     Plaintiffs sustained an ascertainable loss due to Defendant's deceptive practices in the form of payment of tuition and fees which proved to be valueless when, due to Defendant's deceptive practices and their effects on him, John was unable to remain in school.

97.     In addition to compensatory damages, the UTPCPL authorizes courts to grant prevailing plaintiffs reasonable attorneys' fees and costs to be awarded from defendants. 73 P.S.

§ 201-9.2; Neal v. Bavarian Motors, Inc., 882 A.2d 1022, 1029-30 (Pa. Super. 2005); Huu Nam Tran v. Metropolitan Life Ins. Co., 2006 WL 2623230 at **1-2 (W.D. Pa. Sep. 12, 2006).

98.     In addition, courts may award treble damages for violations of the UTPCPL.  73 Pa. C.S. 73 § 201-9.2; Werwinski v. Ford Motor Co., 286 F.3d 661, 668 (3d Cir. 2002).

## COUNT IV - NEGLIGENCE

### John Doe Against Defendant

99.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

100.    Defendant, by virtue of its instituting disciplinary proceedings against him and otherwise, owed Plaintiff John Doe a duty to conduct the investigation and adjudication of The Accuser's accusation fairly, thoroughly, and without bias, and to conduct a fair, impartial, and unbiased hearing to obtain a true verdict.

101.    Defendant breached that duty through the actions set forth above.

102.    Defendant's breach of duty caused John Doe considerable financial and emotional damages, as set forth above.

## VI.    **Relief Requested**

103.    Plaintiffs seek monetary damages, treble damages, and reasonable attorneys' fees and costs under the UTPCPL; monetary damages and reasonable attorneys' fees and costs under Title IX; monetary damages under Pennsylvania law; and any other relief this Court deems necessary and proper.

Respectfully submitted,

_____
Michael E. Gehring, Esquire
ID No. 57224

_____
Dennis C. McAndrews, Esquire
ID No. 28012

_____
Joseph McGettigan, Esquire
ID No. 35821

McANDREWS LAW OFFICES
Attorneys for Plaintiffs
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)

Attorneys for Plaintiffs